[Civ. No. 35310. Second Dist., Div. Two. Oct. 19, 1970.]

KNUDSEN DAIRY PRODUCTS CO. et al., Plaintiffs and Appellants, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

**COUNSEL**

Roemer & Hamwi and Robert P. Chifferman for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, Neal J. Gobar and Mario A. Roberti, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**COMPTON, J.**—Plaintiffs Knudsen Dairy Products Co. (hereinafter referred to as Dairy) sought a refund of $38,077.61 in sales and use tax assessed against plaintiff by defendant State Board of Equalization and paid by Dairy under protest.

Dairy at the time of the assessment and payment was a separate corporate entity, albeit a wholly owned subsidiary of Knudsen Creamery Co. (hereinafter referred to as "Creamery"). Subsequent to the payment, Dairy was merged into Creamery which became the surviving corporation and

successor to the interests of Dairy, and as such was joined as coplaintiff in this action.

The case was tried, without a jury, on the pleadings, a written stipulation of facts with attached exhibits and written briefs. The trial court found that plaintiffs were not entitled to the refund. Plaintiffs appeal.

The evidence to be found in the pleadings, the stipulation and exhibits was uncontroverted and revealed the following factual background:

Dearborn Stores, Inc., a Delaware corporation, doing business under the name of Pix Food Markets, Inc., was organized in November of 1958. By June of 1960, Pix had established a chain of 20 markets in Los Angeles, San Bernardino and Riverside counties. Pix made purchases from Creamery, a distributor of dairy products, and became substantially indebted to Creamery.

By November of 1960, Pix had sustained losses in its market operations which impaired its ability to remain current in its obligations to creditors, and one of its purveyors had sued Pix and placed a keeper on the premises.

In order to avoid a substantial loss and retain the market for its dairy products, Creamery acquired ownership of the outstanding stock of Pix. Creamery caused Pix to make certain managerial changes in an attempt to reverse operating losses. However, Pix's losses continued which resulted in a need for borrowed capital. Creamery then made loans to Pix evidenced by promissory notes. As of March 31, 1962, Pix's indebtedness to Creamery totaled $1,365,000. By December 24, 1962, Pix's indebtedness to Creamery had risen to $1,410,000. The number of stores it operated was, by this time, reduced to four.

As a result of an agreement between Pix and Creamery a plan was adopted which would allow Pix to make payments to its liquidated creditors. Under the plan, all of Pix's creditors holding liquidated claims, except Creamery, would receive cash payments for their claims.

Creamery, as a liquidated creditor, was to receive under the agreement such remaining assets of Pix which did not exceed in value the indebtedness of $1,410,000.

Reduced to its simplest terms the plan operated as follows: After the payment of cash to all of the liquidated creditors, Pix, at Creamery's direction, transferred all of its operating assets to Dairy.[1] Some of its assets in

---

[1]Part of the liquidation plan, which we consider irrelevant to the disposition of the case, provided that Pix's assets were first delivered to La Bon Products Co., another wholly owned subsidiary of Creamery. La Bon Products Co. simultaneously nominated Dairy to receive the assets and Dairy accepted said nomination.

terms of accounts receivable were transferred directly to Creamery. Dairy, in turn, issued to Creamery a promissory note equivalent to the value of the assets which it received. Creamery then credited Pix, in reduction of its indebtedness, in the amount of the value of the assets transferred. This left Pix indebted to Creamery for $68,250.14.

Dairy took possession of the stores and retained the same general offices as Pix, retained Pix's store and office employees, as well as certain of its managerial personnel. However, the name Pix was no longer used and as of December 31, 1962, when this plan was fully implemented, Pix ceased to exist as a corporation. Dairy continued to operate the stores under a new name.

An auditor of the defendant began a regular three-year audit of Pix in October of 1962. The audit covered the period July 1, 1959 to December 31, 1962. This audit was completed on April 10, 1963. However, as a result of the discovery by the auditor after December 31, 1962 of the transaction between Pix and Creamery, the audit was transformed into a close-out audit of Pix. This audit disclosed additional taxable sales of Pix in the sum of $825,553 leading to an additional tax liability on Pix in the sum of $38,001.30, which when interest is added made the total assessment $38,077.61. Dairy paid this amount under protest.

Section 6811 of the Revenue and Taxation Code provides in relevant part: "If any *person* liable for any amount under this part [division 2, part 1] sells out his business or stock of goods or quits the business, his *successors* or assigns shall withhold sufficient of the *purchase price* to cover such amount until the former owner . . . [proves that he has paid or that no amount is due]." (Italics added.)

Section 6812 of the same code provides: "If the *purchaser* of a business or stock of goods fails to withhold *purchase price* as required, he becomes *personally* liable for the payment of the amount required to be withheld by him to the extent of the purchase price, valued in money." (Italics added.)

In passing it is significant to note that while section 6811 uses the term "successors or assigns," section 6812 which imposes the sanction of personal liability uses the term "purchaser."

Title 18 of the California Administrative Code, section 2102 [in 1969 renumbered § 1702], seeks to clarify and construe sections 6811 and 6812. That regulation states in part: "The requirement that a successor or purchaser of a business or stock of goods withhold sufficient of the purchase price to cover the tax liability of the seller, arises only in the case of the

*purchase* and *sale* of a *business* or *stock of goods* under a *contract,* providing for the payment to the seller or person designated by him of a purchase price in *money* or *property* or providing for the *assumption of liabilities* and only to the extent thereof, and does not arise in connection with other transfers of a business such as assignments for the benefit of creditors, foreclosures of mortgages, or sales by trustees in bankruptcy." (Italics added.)

The evidence conclusively showed that there was no *contract* for the *assumption of liabilities.*

In *People* v. *Buckles,* 57 Cal.App.2d 76, at p. 79 [134 P.2d 8], the court said: "It is quite clear to us that it was the intention of the Legislature in enacting said section 26,[2] to prevent a retailer who has failed to pay the state all of the tax due under the act from selling his business and departing with the purchase price, . . ."

Under the authority of sections 6811 and 6812 of the Revenue and Taxation Code, and title 18 of the California Administrative Code, section 2102, and to carry out the purpose of the law as enunciated in *People* v. *Buckles, supra,* the board assessed Dairy as a "successor" to Pix.

Plaintiffs make the following contentions on appeal:

(1) That sections 6811 and 6812 of the Revenue and Taxation Code, as interpreted in regulation 2102, were not applicable to the transaction in question.

(2) That because there was no purchase price paid from which a withholding could have been made, the assessment and collection violate Dairy's constitutional rights.

(3) The findings and conclusions are not supported by the evidence and the law.

We are not here dealing with a tax liability originally imposed on either Dairy or Creamery as a result of their business activities. The statutes in question are a device for the collection of a tax by the imposition of a secondary liability. The secondary liability for the tax which is imposed by section 6812 arises from a definite act or omission, that is, the failure to withhold the amount of the tax from the purchase price as required by section 6811.

 Tax laws are to be strictly construed in favor of the taxpayer. (*Barker Bros., Inc.* v. *Los Angeles,* 10 Cal.2d 603 [76 P.2d 97].) This is

---

[2]Section 26 of the Retail Sales Act. This section is a predecessor of sections 6811 and 6812 of the Revenue and Taxation Code.

especially true where the statute seeks to impose the tax liability of one person on another in order to facilitate its collection.

█ This case then presents a question of interpretation of sections 6811 and 6812 of the Revenue and Taxation Code. That question turns on the definition of the terms "purchaser," "purchase price," "successor" and "withhold."

It is clear that Dairy was the successor to Pix in that Dairy acquired the major operating assets of Pix, and continued to operate the business. It is hard to imagine a more complete take-over of a going business than what occurred here.

The trial judge found that Dairy was also the "purchaser" of Pix, and that by failing to withhold a sufficient amount of the purchase price to satisfy Pix's tax liability, became personally liable therefor under the provisions of sections 6811 and 6812 of the Revenue and Taxation Code.

The starting point, of course, is that admittedly Pix owes the State of California $38,001.30 in sales tax. Presumably, this money had been collected from customers and until paid over to the state served to augment the total value of Pix's assets. As a result of the liquidation agreement there is now no money or assets held by Pix from which the tax can be paid.

In *People* v. *Buckles, supra,* the court indicated that the legislative intent in these "successor" liability statutes was to prevent the taxpayer from evading his liability, by requiring the purchaser to take the precaution of demanding either a receipt of the State Board of Equalization that the tax had been paid or a certificate that no tax was due before paying over the purchase price to the seller. It was held not to be unreasonable to impose upon a purchaser who failed to protect himself and the state in this manner the statutory liability for the amount of the tax up to the amount of the purchase price.

It appears that while the Legislature in section 6811 speaks of successors and assigns, they limit the definition of a successor or an assignee to a "purchaser" by the use of that phrase in section 6812.

The state has recognized in its regulation 2102 that where the seller did not receive a purchase price from which a withholding could be made, the purchaser cannot protect the state's interests and therefore cannot be held liable.

We interpret sections 6811 and 6812 to require that for a successor or assign to become personally liable for the tax liability of another, such *successor* must also be a *purchaser* who, through the handling of the purchase price or the form thereof, was in a position to protect the state's interest in collecting taxes which were due and owing.

The evidence discloses that either Dairy or Creamery was in a position in this transaction to protect the state's interest and protect themselves from liability and failed to do so.

■ As an appellate court we are required to view the evidence in the light most favorable to supporting the judgment.

■ The evidence suports the trial court's findings that Dairy was a purchaser of the Pix business. The purchase price was represented by a promissory note delivered to Creamery. Sections 6811 and 6812 were applicable to the transaction.

Clearly there would be no problem in finding that Dairy was a "purchaser" if Dairy had delivered its promissory note directly to Pix, who in turn delivered that note to Creamery, in payment for its debt.

In a purchase and sale, the purchase price need not necessarily flow directly to the seller. The fact that the purchase price here went to a third party, to wit, Creamery, does not militate against the finding that Dairy was a "purchaser." To hold otherwise would permit a taxpayer to avoid liability by the simple device of having the purchase price paid through an intermediary.

Furthermore, it is clear that in the circumstances of present day business practice it would be illogical to hold that a "purchase price" must take the form of cash or tangible property. Most, if not all, purchases of any size and substance in today's economic world involve a promissory note for at least some part of the purchase price.

The legislative intent on this point appears quite clear. The sections under question formerly used the phrase "purchase money." By amendment in 1941, the term "purchase money" in section 6811 was changed to "purchase price" and in section 6812 to "purchase price valued in money."

Plaintiffs urge that Dairy was not a "purchaser" in that it had no privity with Pix, but simply received the assets at Creamery's direction. Therefore, plaintiffs suggest that defendant, if it assessed anyone, should have assessed Creamery. However, plaintiffs also take the position that in the final analysis Creamery could not be held liable because it paid no "purchase price" from which a withholding could have been made and to do so would unconstitutionally impose liability for failure to perform a duty which was impossible of performance.

■ We agree with plaintiffs that the successor liability cannot be imposed when the duty to withhold, as here defined, under section 6811 cannot possibly be performed by the successor.

However, as we interpret it, the term "withhold" as used in the statute does not necessarily mean having physical assets in hand but simply means dealing with the purchase consideration in such a manner as to deny to the seller the benefit of the purchase consideration and to thereby make a portion of it available for the satisfaction of the tax liability.

Defendant argues that it is immaterial as to who was the purchaser or successor as between Dairy and Creamery because if Creamery was the purchaser and successor, Dairy could still be held liable as a "successor" to a "successor." Because of the finding that Dairy was the purchaser and successor to Pix, we do not need to deal with this proposition.

Defendant contends also that if Dairy receives a refund, Creamery, because of the merger, will benefit and will thereby be unjustly enriched.

## The Corporate Entities

To adequately dispose of the points raised by the parties it is necessary to examine the status and relationship of the corporate entities involved.

The contracts which resulted in the liquidation of Pix were each signed by two officers of each corporation.

David R. Snookal and Troy B. Gaddy were vice-president and secretary, respectively, of Pix. Robert E. Osborne and I. L. Bibler were president and secretary, respectively, of Creamery. David R. Snookal and I. L. Bibler were president and secretary, respectively, of Dairy.[3]

Creamery owned all outstanding stock in both Pix and Dairy.

Plaintiffs urge that we preserve the independence of the corporate entities. In fact they contend that we may not apply the *alter ego* doctrine because defendant failed to plead it as an equitable defense and the trial court made no finding on it. At the same time, however, they ask us to ignore the role of Dairy in the transaction in suggesting that defendant should have looked to Creamery as successor.

In so doing they find themselves on the horns of a dilemma. If we ignore the independence of Dairy and conclude that Dairy acted only at the direction and under the control of Creamery we would be compelled to apply the same view to the relationship between Pix and Creamery. The two relationships are factually indistinguishable.

Creamery had actively caused managerial changes in Pix's operation and actively directed the dissolution of Pix.

[3]Robert E. Osborne and I. L. Bibler were vice-president and secretary, respectively, of La Bon Products Co. (See fn. 1 on p. 4.)

■ We agree with plaintiffs that ordinarily the mere cancellation of an existing debt by the transfer of business assets in kind to a creditor would not constitute a "purchase price" nor impose tax liability on the creditor as a "successor" as we have here interpreted those terms.

Here, however, Creamery was more than an ordinary creditor and cannot equitably seek a refund of the tax either because it in effect *was* "Pix" and therefore the "seller" or because Dairy was the purchaser and successor and Creamery now stands in Dairy's shoes.

■ An action brought to recover a tax allegedly, improperly or erroneously paid is equitable in nature.

In *Stone* v. *White*, 301 U.S. 532 [81 L.Ed. 1265, 57 S.Ct. 851], testamentary trustees sought a refund of tax paid on the income of the trust estate. The court concluded that the tax should have been paid by the beneficiary of the trust. The government's claim against the beneficiary was barred by the statute of limitations. Recovery by the trustees was denied because such recovery would have inured to the benefit of the beneficiary. The court said at page 535: "The statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received. [Citation.] Since, in this type of action, the plaintiff must recover by virtue of a right measured by equitable standards, it follows that it is open to the defendant to show any state of facts which, according to those standards, would deny the right, [citations] even without resort to the modern statutory authority for pleading equitable defenses in actions which are more strictly legal, [citation]."

It would have been a simple matter for Creamery, at the time that the liquidation plan was being developed, to provide that cash be set aside for the payment of the tax liability or that sufficient assets be retained by Pix to satisfy the tax liability and to that extent reduce the credit which it afforded Pix in the reduction of its indebtedness. Similarly, Dairy could have reduced, by the amount of the tax liability, the size of the note which it gave to Creamery.

Prior to the time that the liquidation plan was developed Pix did have cash on hand or sufficient assets by which it could have paid its tax liability. If Pix had become insolvent or gone into bankruptcy, the state's tax claim would have had priority and would have been a preferred claim in any such proceeding. (11 U.S.C.A. § 104; Rev. & Tax. Code, § 6757.) Because of this liquidation plan, the state has been deprived of its preferred priority status.

The major consideration in this case from Creamery's standpoint was

to keep Pix afloat as a going business. A key asset which Creamery, through Dairy, acquired was the continuing of Pix as a sales outlet and the prevention of Pix's insolvency. This cannot be accomplished at the expense of depriving the state of that which is due it on a valid and existing tax liability.

Plaintiffs do not contend that sections 6811 and 6812 in providing for successor liability are per se unconstitutional. In fact, they frankly admit in their briefs that "There can be no dispute as to the legitimacy of requiring a purchaser of a business who is about to pay over a purchase price to the seller from which a withholding of taxes may be made to verify that tax liabilities have been satisfied . . ." With this we agree.

The trial court further found:

(a) "Defendant did not unreasonably prefer other creditors of Pix over the plaintiffs in asserting successorship liability against Dairy.

(b) "Defendant had a reasonable basis to hold Dairy as a successor to Pix, and it was reasonable for the defendant to classify the plaintiffs differently from other creditors.

(c) "Sections 6811 and 6812 of the Revenue and Taxation Code did not unreasonably prefer other creditors of Pix over the plaintiffs; the sections had a reasonable basis upon which successorship liability was imposed upon Dairy, and it was reasonable for the sections to classify the plaintiffs differently from other creditors.

(d) "Defendant in its assessment and collection activities imposed a reasonable duty upon Dairy to provide for payment of Pix's unpaid tax liability in the negotiations resulting in Dairy's purchase of Pix's business and assets, and imposed a reasonable duty upon Dairy to withhold sufficient of the purchase price to pay Pix's tax liability to defendant.

(e) "Sections 6811 and 6812 of the Revenue and Taxation Code imposed a reasonable duty upon Dairy to provide for payment of Pix's unpaid tax liability in the negotiations resulting in Dairy's purchase of Pix's business and assets, and imposed a reasonable duty upon Dairy to withhold sufficient of the purchase price to pay Pix's tax liability to defendant."

The trial court further concluded that:

"Equity and good conscience dictates that the plaintiffs cannot now assert the argument that the defendant should have held Creamery rather than Dairy as a successor to Pix. Otherwise, Creamery, as the surviving corporation in the merger with Dairy, would be unjustly enriched in the amount of any refund while escaping its liability as a successor to Pix."

In light of our interpretation of sections 6811 and 6812 of the Revenue and Taxation Code and our interpretation of the facts, the trial court's findings and conclusions were correct and well supported by the evidence.

The judgment is affirmed.

Roth, P. J., and Herndon, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 17, 1970.