BANK OF COMMERCE, a Tennessee Banking Corp., with offices and principal place of business in Morristown, Hamblen County, Tennessee, Appellant,

v.

Jayne Ann WOODS, Commissioner of Revenue, State of Tennessee, Nashville, Tennessee, Appellee.

Supreme Court of Tennessee.

Aug. 13, 1979.

H. Scott Reams, Taylor, Tilson, Inman & Reams, Morristown, for appellant.

William M. Leech, Jr., Atty. Gen., Jim G. Creecy, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

FONES, Justice.

In a suit by plaintiff, Bank of Commerce, to recover sales taxes paid under protest,

the trial court granted the Commissioner's motion for summary judgment. The sales taxes were incurred by the owners of a food store. The Bank held a security interest in the inventory, furniture, fixtures and equipment, and after default, the owner-debtor transferred the secured property to the Bank. The Bank operated the food store as a going business for a short time and then sold it to a third party.

The issue is whether the Bank was a successor of, and liable for the sales taxes owed by, delinquent taxpayers who sold or quit a business, within the purview of T.C.A. § 67–3025.

The Bank's principal defense is that it provided no cash "purchase money," as that term is used in the statute, to the taxpayers and thus was not in a position to protect the State's interest because it had no fund from which to withhold the delinquent sales tax. Our analysis of the relevant case law from other jurisdictions, including cases relied upon by the Bank of Commerce, persuades us that the Bank should be held liable for its transferor's sales tax, and we affirm the judgment of the trial court.

The facts of the case are undisputed. Prior to June 1976 the Bank of Commerce made a secured loan of $50,000 to Tucker Enterprises in order to finance the operation of a convenience food store in Morristown. In June of 1976 Tucker Enterprises sold the store to Clifford and Pelle Stepp, who assumed the indebtedness to the Bank, then in the amount of $44,627.59, as part of the purchase agreement. Between June 1976 and February 1977 the Stepps became delinquent in their payments on the note, and in February 1977 the parties restructured the note to include and bring to a current status the principal and interest, a total of $49,200. At all times the Bank of Commerce had a perfected security interest in all inventory, furniture, equipment and fixtures in the Stepps' store.

The Stepps again fell behind on their payments, and when they failed to bring their note to current status by June 1977 the Stepps agreed to transfer their entire interest in the business to the Bank of Commerce in consideration of a settlement of the $49,200 note. The Bank of Commerce contends that it desired to avoid a foreclosure because of the possible harm to the Stepps' credit record, as well as the adverse effect on the store itself. According to the deposition of C. G. Williams, president of the Bank of Commerce, the Bank appreciated the business advantages in avoiding a foreclosure:

"Well, at that particular time, the new convenience store had just opened across the street and this business is located right beside a Holiday Inn, and right at an entranceway to a large subdivision. And we felt that had we closed that business down, that with the neighborhood business they had acquired and had a following from, would immediately shift across the street to the new store. It was tough enough to lose or have the possibility of losing a share of the business anyway as a going concern. But if we closed the doors and they remained closed for some period of time during foreclosure proceedings, we felt we would have serious difficulties getting that business back.

More than that, though, is probably the fear of the drastic reduced value of that inventory during the period it would be closed."

Thus, the Stepps executed a "bill of sale" as "sellers" to the Bank of Commerce as "buyer," and the Bank proceeded to find a new owner for the store. On July 1, 1977, the Bank transferred its interest in the store to the present owner, Leonard Dryer, who agreed to assume the outstanding balance on the Stepps' note. A notice of the state tax lien was recorded in the Registrar's Office of Hamblen County against Clifford and Pelle Stepp on September 16, 1977. The Commissioner of Revenue made a final demand for payment on the Bank of Commerce pursuant to the successor liability provisions of T.C.A. § 67–3025, and on December 21, 1977, the Bank paid $3,634.41 to the Department of Revenue under protest.

The Bank of Commerce filed this lawsuit in January 1978 for a refund plus interest, and after both parties moved for summary judgment based upon the pleadings, the deposition of the president of the Bank of Commerce and supporting briefs, the trial court granted judgment for defendant and ruled that the Bank of Commerce was not entitled to a refund since it was liable under T.C.A. § 67–3025 for the sales tax owed by the Stepps.

T.C.A. § 67–3025 provides as follows:

"67–3025. *Settlement of tax on quitting business—Collection of tax from debtor or dealer.*—(a) If any dealer liable for any tax, interest or penalty levied hereunder shall sell out his business or stock of goods, or shall quit the business, he shall make a final return and payment within fifteen (15) days after the date of selling or quitting the business. His successor, successors, or assigns, if any, shall withhold sufficient of the purchase money to cover the amount of such taxes, interest, and penalties due and unpaid until such former owner shall produce a receipt from the commissioner showing that they have been paid, or a certificate stating that no taxes, interest, or penalties are due. If the purchaser of a business or stock of goods shall fail to withhold the purchase money as above provided, he shall be personally liable for the payment of the taxes, interest, and penalties accruing and unpaid on account of the operation of the business by any former owner, owners, or assigns.

(b) In the event any dealer is delinquent in the payment of the tax herein provided for the commissioner may give notice of the amount of such delinquency by registered mail to all persons having in their possession or under their control any credits or other personal property belonging to such dealer, or owing any debts to such dealer at the time of receipt by them of such notice, and thereafter any person so notified shall neither transfer nor make any other disposition of such credits, other personal property, or debts, until the commissioner shall have consented to a transfer or disposition, or

until thirty (30) days shall have elapsed from and after the receipt of such notice. All persons so notified must, within five (5) days after receipt of such notice, advise the commissioner of any and all such credits, other personal property, or debts, in their possession, under their control, or owing by them, as the case may be.

(c) Any violation of the provisions of this section shall be a misdemeanor and punishable as such. [Acts 1947, ch. 3, § 7; C.Supp. 1950, § 1248.63 (Williams, § 1328.29).]"

■ Although there are no decisions construing this statute in Tennessee, cases from other jurisdictions with similar statutes have discussed the purpose behind successor liability statutes. It generally has been recognized that the purpose of such statutes is to insure the collectibility of sales taxes due the state by imposing liability upon the purchasing corporation, which is in a financially better position to collect the tax ordinarily than the vendor corporation, which is quitting the business. The clear intention of statutes such as T.C.A. § 67–3025(a) is to provide that the "tax debt . . . follow the business, its assets or any portion of them" *Tri-Financial Corp. v. Department of Revenue*, 6 Wash. App. 637, 641, 495 P.2d 690, 692 (Ct.App. 1972); *see also* Annot.: *Validity and Construction Of State Statute Making Successor Corporation Liable For Taxes Of Predecessor*, 65 A.L.R.3d 1181, 1184–87 (1975).

■ The Bank of Commerce contends that the statute imposes liability upon a transferee only if it fails to "withhold sufficient of the purchase money to cover the amount of such [unpaid] taxes . . . ." Because it did not provide any money to the Stepps in connection with its purchase of the store, the Bank argues that it was not required to "withhold" the amount of the unpaid taxes. The Bank characterized the June 1977 transaction as the "satisfaction of a security interest which was accomplished without the necessity of a lawsuit." To allow the Commissioner of Revenue to collect a tax from the Bank under such

circumstances, the Bank argues, would encourage unnecessary litigation and result in a "windfall" to the Commissioner of Revenue.

We disagree with the position taken by the Bank of Commerce and find that cases from other jurisdictions that have considered similar issues have broadly construed successor liability statutes in order not to jeopardize the interest of the public in insuring the collectibility of taxes. *See, e. g., People ex rel. Salisbury Axle Co. v. Lynch,* 259 N.Y. 228, 181 N.E. 460 (1932); *Sterling Title Co. v. Commissioner of Revenue,* 85 N.M. 279, 511 P.2d 765 (Ct.App. 1973); *Tri-Financial Corp. v. Department of Revenue, supra; see generally* Annot., *supra.*

In *Knudsen Dairy Products Co. v. State Bd. of Equalization,* 12 Cal.App.3d 47, 90 Cal.Rptr. 533 (1970), a supermarket corporation became heavily indebted to a dairy products company and transferred all of its operating assets to a wholly-owned subsidiary of the dairy products corporation in exchange for the subsidiary's issuance of a promissory note for the value of the assets to the parent company, which agreed to cancel a portion of the supermarket corporation's debt. The court held the subsidiary corporation liable under a statute that required a "successor or assigns" of a delinquent taxpayer to withhold the amount of such taxes from the "purchase price." The subsidiary corporation argued that it was not a "purchaser" of the supermarket corporation's assets, which the court found was intended by the legislature even though the statute referred to successors and assigns, because the purchase price was received by a third party, the dairy products corporation. The *Knudson* court rejected this argument, reasoning:

"In a purchase and sale, the purchase price need not necessarily flow directly to the seller. The fact that the purchase price here went to a third party, to wit, Creamery, does not militate against the finding that Dairy was a 'purchaser.' To hold otherwise would permit a taxpayer to avoid liability by the simple device of having the purchase price paid through an intermediary.

Furthermore, it is clear that in the circumstances of present day business practice it would be illogical to hold that a 'purchase price' must take the form of cash or tangible property. Most, if not all, purchases of any size and substance in today's economic world involve a promissory note for at least some part of the purchase price.

.    .    .    .    .

We agree with plaintiffs that the successor liability cannot be imposed when the duty to withhold, as here defined, under section 6811 cannot possibly be performed by the successor.

However, as we interpret it, the term 'withhold' as used in the statute does not necessarily mean having physical assets in hand but simply means dealing with the purchase consideration in such a manner as to deny to the seller the benefit of the purchase consideration and to thereby make a portion of it available for the satisfaction of the tax liability." 12 Cal. App.3d at 54–55, 90 Cal.Rptr. at 538–39.

Our successor liability statute broadly imposes a duty on a "successor, successors, or assigns" of a taxpayer who sells out or quits his business. The use of the words "purchase money" cannot be construed as a limitation on this duty, but is merely a descriptive term of the action to be taken by the person or business entity on whom the duty has been imposed.

■ In *State v. Sloan,* 164 Ohio St. 579, 584, 132 N.E.2d 460, 464 (1956), the Ohio Supreme Court upheld a similar statute which was challenged because of the absence of notice, and said:

"It was their duty to discover whether such taxes were due at the time they purchased the business, and, if they had complied with the statutory requirements which they are presumed to know, they would have been completely aware of the tax situation in regard to the business which they were purchasing."

*Accord, Richards v. Blackmon,* 233 Ga. 739, 213 S.E.2d 638 (1975). It would have been a simple procedure for the Bank to require a certificate from the Department of Revenue that the Stepps had paid sales taxes due the State in connection with its purchase of the assets. It would have been one more factor to weigh in the decision whether to foreclose on their security interest or continue the business. The public interest in the efficient collectibility of State revenue cannot be jeopardized on account of private business decisions. When the Bank decided to purchase the store instead of foreclosing on the loan, it took the risk that it would be liable for unpaid sales taxes.

■ The Bank of Commerce contends that it actually was foreclosing on its security interest rather than purchasing the assets of the store, despite the execution of a purchase and sale agreement. We find that the evidence does not support this proposition because it is obvious from the desposition of the Bank's president that it was the intention of the parties that foreclosure be avoided.

The Bank relies on *State v. Standard Oil Co.,* 39 Ohio St.2d 41, 313 N.E.2d 838 (1974). Standard terminated the gasoline service station lease of Donald Bleim for breach of the terms of the lease. Standard owned a large portion of the equipment located on the premises and had a UCC security interest in the inventory, equipment and accounts receivable belonging to Bleim, to secure any indebtedness due it by Bleim. In terminating the business relationship between them, Bleim transferred and conveyed to Standard certain inventory and merchandise listed on a schedule showing the amount of credit allowed for each item. Bleim also executed a bulk sales affidavit at Standard's request. The State of Ohio sought to collect Bleim's delinquent sales taxes from Standard pursuant to its successor liability statute, relying principally upon the execution of the bulk sales affidavit as converting a foreclosure into a sale. The Supreme Court of Ohio held that in consideration of the totality of the business dealings and contractual relationship between the parties, the execution of the bulk sales affidavit, which characterized the transaction as a purchase, did not have the effect of converting a foreclosure into a sale. In short, the Court held that substance would prevail over form.

There are obvious distinctions between the totality of the business and contractual relationships of Standard and Bleim and those existing between the Bank and the Stepps, as in the documents that evidenced the two transactions. But, conceding that *State v. Standard Oil Co., supra,* supports the Bank's position, we think it represents the minority view of those jurisdictions that have considered the issue of successor liability in similar context and we are not disposed to follow that Court. In the field of taxation the dichotomy of form and substance is not applied with the same force as in other areas of the law, and the form is often treated as the substance of the transaction.

■ Unlike the *Standard Oil* case, however, the substance of the transaction in this case was not an enforcement of the Bank's rights under the security agreement. The deposition of the Bank's president unequivocally reveals its actual intentions in structuring the transaction as it did. The Bank desired to protect its investment and avoid a foreclosure, by purchasing the food store so that it could be operated without interruption as a going business. The Stepps sold their equity in satisfaction of the debt and quit the business. The Bank as buyer became their successor and liable for the sales tax. The fact that the Bank's objective was to be a short-term owner and in turn to sell the going business to a third party did not alter their successor status under the statute.

The judgment of the trial court is affirmed. Costs are adjudged against appellant, Bank of Commerce.

BROCK, C. J., and COOPER, HENRY and HARBISON, JJ., concur.