James R. BATES d/b/a the Manor Inn,
Successor, Appellant,

v.

DIRECTOR OF REVENUE, State of
Missouri, Respondent.

No. 65925.

Supreme Court of Missouri,
En Banc.

May 29, 1985.

**274**

James L. Sivils, Jr., Springfield, for appellant.

John Ashcroft, Atty. Gen., Richard L. Wieler, Jefferson City, for respondent.

RENDLEN, Chief Justice.

James Bates appeals from the Administrative Hearing Commission's dismissal of his challenge to a sales tax assessment by the Director of Revenue under Missouri's successor liability statute, § 144.150, RSMo 1978.[1] The statute provides in pertinent part that successors to a business must withhold from the purchase price an amount sufficient to satisfy any sales taxes not paid by a previous owner and if the successor fails so to do he risks liability for his predecessor's delinquency.

Bates purchased the Manor Inn, a motel, restaurant and lounge complex, without satisfying a delinquent sales tax assessment arising from the operation of the business by a former owner. He contests derivative liability, arguing he is not a "successor" within the meaning of the statute and hence not subject to liability for the taxes due. This cause, turning on construction of Missouri's revenue laws, falls within the original appellate jurisdiction of the Court. Mo. Const. Art. V, § 3.

In 1970 Jack and Virginia Rogers purchased the property in question from the Carney family. The Rogers executed a $660,062.69 promissory note to the Carneys and a first deed of trust encumbering the motel property to secure payment of the note. The property passed through several hands and in 1973 was conveyed to Manor Inn, Inc., a corporation owned and controlled by J. Douglas Cassity. When Cassity purchased the property he assumed the obligation of the outstanding promissory note held by the Carney family.[2] It was during Cassity's operation of the Manor Inn the challenged sales tax delinquency occurred. In February 1979 Cassity exe-

1. All references are to RSMo 1978.

2. The record does not disclose from whom Cassity purchased the property, merely that it was conveyed through "mesne and sundry conveyances." There is no dispute however, that Cassity acquired the property subject to the Carney deed of trust.

cuted and delivered to Great Southern Savings and Loan Association his promissory note in the amount of $790,000 secured by a deed of trust on the motel property junior to that of the Carneys.

Cassity defaulted on the Carney note and a successor-trustee under the first deed of trust sold the property at foreclosure sale to Great Southern for $902,000. Great Southern paid the full amount of the purchase price and received title by trustee's deed. The Trustee paid approximately $301,000 of the purchase price to Great Southern on its junior note and held the remaining $601,000 for satisfaction of the Carney note and for payment of an accompanying claim for attorney's fees. Cassity, contesting the legality of the foreclosure sale, presented written objections to Carney's Trustee. Great Southern in turn challenged the amount of attorney's fees allocated in the sale price. In response to these challenges, the Trustee filed his petition for declaratory judgment and deposited the contested funds in the registry of the Phelps County Circuit Court. The petition, naming the Carneys, Manor Inn Inc. (Cassity) and Great Southern as defendants, requested that the court declare the foreclosure sale valid and approve the proposed disbursement of funds in the Trustee's hands.

While the action for declaratory judgment was pending, appellant sought to purchase the motel complex and in contemplation thereof the suit was settled. As a result of this settlement Bates transferred $3,000 in gems to Cassity and received from Cassity a quit claim deed conveying his interest in the realty and a bill of sale for the personal property constituting the physical assets of the Manor Inn business. Bates also executed a promissory note in the amount of $975,000, secured by his deed of trust on the property, to Great Southern and received from Great Southern a quit-claim deed conveying its interests in the realty and a bill of sale for the personal property of the Manor Inn. These transactions occurred pursuant to a "loan agreement" entered into by Bates and Great Southern which named Cassity as the seller of the Manor Inn property. Later the Director of Revenue assessed against Bates $17,289.03 in delinquent sales tax (including interest and penalties) which had accrued during Cassity's operation of the Manor Inn.[3]

Bates sought review before the Administrative Hearing Commission and from an adverse ruling there, appeals to this Court. The Commission made no determination as to whether Bates purchased the Manor Inn property from Cassity or Great Southern but found him liable as a successor regard-

**3.** Curiously the author of the dissenting opinion asserts that an understanding of the transaction involved in this case "requires a more detailed statement of facts than that provided by the principal opinion" of the Court. The inaptness of this assertion becomes clear from a comparison of the factual account set forth in this, the principal opinion with that of the dissent. The principal opinion details the dispositive facts of the case. No additional facts pertinent to the issues are presented by the dissent which merely paraphrases and tracks in part the factual recitals of the majority. Further, the dissent fails to acknowledge relevant clauses of the "loan agreement" which support a conclusion that both Great Southern and Cassity asserted legal interests in the real property at the time of Bates' purchase. The dissent seems unwilling to consider the totality of the circumstances and read together *all* the instruments executed April 1st and 25th, 1980, which include the Settlement Agreement and dismissal of the declaratory judgment action, two quit claim deeds, two bills

of sale for personalty and the loan agreement. The selective rendition of facts by the dissent leads to an erroneous conclusion regarding the circumstances of Bates' purchase.

Moreover, the dissent's suggestion that the opinion adopted today will impair Missouri businessmen's opportunity to borrow money discloses a misunderstanding of the law of the case. The focus here is *not* on the liability of the "purchaser at foreclosure" for payment of sales tax. The legislature, in the statute we are called on to construe, demonstrates an intent by the use of the broad general term "successor" that such "successor" shall withhold purchase money until the former owner or predecessor in the business produces a receipt or certificate that no taxes are due. We are neither free to ignore the terms of the statute nor disposed to criticize the legislature for a policy designed to protect the State as well as purchasers in a manner similar in operation and purpose to the Bulk Sales Law.

less of which might be his predecessor in title. Bates insists he purchased the property from Great Southern, not Cassity, and accordingly was not a "successor" within the meaning of the statute, this because Great Southern purchased from the foreclosing Carney Trustee and that foreclosure severed the line of succession, protecting Great Southern and Bates from derivative liability as a matter of law.

In this review, the decision of the Commission must be upheld if authorized by law and supported by competent and substantial evidence. § 621.193 RSMo Supp. 1984 (formerly codified as § 161.338 RSMo 1978). We affirm.

Section 144.150 provides:

**Withholding of tax money in case of sale of business.** If any person required to remit a tax levied hereunder or his successors shall sell his or its business or stock of goods or shall quit the business, he shall make a final return under oath within fifteen days after the date of selling or quitting business. All successors, if any, shall be required to withhold sufficient of the purchase money to cover the amount of such taxes and interest or penalties due and unpaid until such time as the former owner or predecessor, whether immediate or not, shall produce a receipt from the director of revenue showing that they have been paid, or a certificate stating that no taxes are due. If the purchaser of a business or stock of goods shall fail to withhold the purchase money as above provided, he shall be personally liable for the payment of the taxes, interest and penalties accrued and unpaid on account of the operation of the business by the former owner and person.

There are no Missouri cases construing this section, however decisions interpreting similar statutes from other jurisdictions are instructive. *See generally* Annot., 65 A.L. R.3d 1181 (1975). The courts of sister states consistently emphasize that the purpose of successor liability statutes is to secure collection of taxes by imposing derivative liability on purchasers of a business who are generally in a better financial position to collect or pay the tax from the sale price than the seller quitting the business. *E.g., Bank of Commerce v. Woods,* 585 S.W.2d 577 (Tenn.1979). Such statutes are given broad construction so not to jeopardize the state interest in securing collection of taxes. *Bank of Commerce,* 585 S.W.2d at 581; *see Sterling Title Company of Taos v. Commissioner of Revenue,* 85 N.M. 279, 511 P.2d 765 (App.1973); *Tri-Financial Corporation v. Department of Revenue,* 6 Wash.App. 637, 641, 495 P.2d 690, 692 (1972).

■ When determining the meaning of the statutory term "successor," consideration of the entire section is necessarily the starting point. Though it contains no separate definition of its terms, the statute obligates "all successors" to "withhold sufficient of the purchase money" to provide for outstanding taxes and imposes personal liability on a "purchaser" who fails so to do. One who acquires property without purchasing cannot withhold purchase money and necessarily cannot be held liable as a "successor" within the meaning of the statute. To be a *successor* one must be a *purchaser* of the business property in question. *Knudsen Dairy Products Company v. State Board of Equalization,* 12 Cal.App.3d 47, 53, 90 Cal.Rptr. 533, 538 (1970); *see State v. Standard Oil Company,* 39 Ohio St.2d 41, 313 N.E.2d 838 (Ohio 1974); *Bank of Commerce,* supra.

■ Turning to the question of whether appellant purchased from Cassity or Great Southern we note that appellant was fully apprised of Cassity's relationship to the property in question. Not only was the record title to the land available showing Cassity's interest but Cassity remained in physical control until the very last when appellant finally took possession. Further, in the settlement arrangement of the Trustee's declaratory judgment action, Cassity's interest was contemplated by all the parties. Appellant paid Cassity $3,000 in gems for a quit claim of Cassity's interest in the realty and his bill of sale for the personalty. In addition the loan agreement

between Bates and Great Southern states that the appellant "contracted with" *Cassity* for the sale of the Manor Inn business property. Thus it can be said the record permits our conclusion that appellant purchased from and is a successor to Cassity, and provides sufficient competent evidence to support the Commission's determination that appellant was a successor with in the meaning of the statute.

■ We next consider appellant's contention that he was a successor only to Great Southern and because the Association acquired its interest from the foreclosure sale, no liability for the delinquent sales tax attaches to Great Southern or appellant.

Appellant in support of his argument that the foreclosure sale insulates him from derivative liability cites *State v. Standard Oil,* supra. There Standard Oil foreclosed on secured operating assets when its franchisee defaulted on lease payments and Standard Oil *assumed ownership* of the assets under its security agreement. The State taxing authority attempted to impose liability on Standard for its franchisee's delinquent taxes but the Ohio court held there was no purchase of the property by the foreclosing party and successor liability could not attach. In the instant case neither the Carney Trustee nor any beneficiary of the Carney deed of trust "assumed ownership" at the foreclosure. Instead the Trustee exercised a power of sale and pursuant to that sale transferred the assets (so sold) to Great Southern, and the tax liability follows.

■ Appellant also argues that *104, Inc. v. Liquor Control Commission,* 13 Ohio Misc. 75, 233 N.E.2d 622 (1967), should control here. In that case a court-appointed receiver in bankruptcy sold the assets of a bankrupt corporation to a third party. The Ohio court held that the third party was not a successor because the appointment of the intervening receiver deprived the former owner of its right to sell the business. First it should be noted that the appointment of the receiver and the rights in bankruptcy distinguish the case from that sub judice. Moreover we are not persuaded that such result should obtain in like cases here, for it is the clear intention of successor liability statutes to provide that the tax debt follow the business, its assets or any portion of them. *Tri-Financial Corp.,* 6 Wash.App. at 641, 495 P.2d at 692; *Bank of Commerce,* 585 S.W.2d at 580.

■ Notwithstanding the analysis of the Ohio court in *104, Inc. v. Liquor Control Commission,* supra., we hold our statute mandates derivative liability under the facts of this case. The statute does not require that Bates be an immediate successor to Cassity. It specifically imposes the duty to withhold purchase money on "[a]ll successors ... until such time as the former owner or predecessor, *whether immediate or not,"* (emphasis added) shall produce a receipt from the Director showing that the taxes are paid or a certificate stating no taxes are due. Section 144.150. The statute contemplates the possibility of a series of successors placing on the immediate purchaser the duty to ascertain whether any taxes are due, and if so, to withhold purchase money. Personal liability attaches to the purchaser of the property as that person can best protect the state's interest and is in possession of the business assets which the tax debt is deemed to follow. *Bank of Commerce,* 585 S.W.2d at 580; *Knudsen,* 12 Cal. App.3d at 53, 90 Cal.Rptr. at 538.

■ This implicates Great Southern as a successor under the statute though it did not operate the business. The Savings and Loan Association acquired the property from an owner-operator and then resold to Bates—another owner-operator. We do not believe intermediate transactions are beyond the statute's purview and the legislative intent is not to so limit the taxing authority's ability to collect. If it were otherwise purchasers could avoid successor liability simply by funneling the transaction through a third party. *See Knudsen,* 12 Cal.App.3d at 54, 90 Cal.Rptr. at 538. The statute specifically provides for the possi-

bility of intervening successors so that a tax delinquent or his successors may not avoid the tax by the device of successive transfers. Great Southern should have withheld from the Carney Trustee that portion of the purchase amount necessary to cover any outstanding sales tax.[4] The statute also obligates Bates as Great Southern's successor, and he in turn should have protected the state's interest by providing for the satisfaction of the tax liability. Whether Bates has an action against Great Southern under the statute is a question we do not decide.

Bates finally argues he cannot be liable under the statute because consideration for the sale was commercial paper, not "money" as required by the statute, and hence no "purchase money" changed hands from which he could withhold the delinquent taxes. Such a narrow interpretation of the statute would defeat the clear legislative purpose. In modern business practice the use of commercial paper, vis-a-vis currency, in transactions such as this is so universally employed that we cannot accept the argument that the term "purchase money" was intended by the Legislature to be limited to cash transactions. We construe the use of the term "purchase money" as descriptive of "the action to be taken by the person or business entity on whom the duty has been imposed." *Bank of Commerce*, 585 S.W.2d at 581; *see Knudsen*, 12 Cal.App.3d at 55, 90 Cal.Rptr. at 539. Bates could have contemplated the tax delinquency and accordingly adjusted the amount of the promissory note he executed to Great Southern.

We find the Commission's decision holding appellant liable as a successor is authorized by law and supported by competent and substantial evidence. Bates purchased the Manor Inn property and failed to require Cassity or Great Southern to produce a Department of Revenue receipt for sales

tax paid or a certificate stating that no taxes were due. As Bates is presumed to be aware of the statutory requirements, *see Bank of Commerce*, 585 S.W.2d at 581, he shall be held to them.

Judgment affirmed.

HIGGINS, GUNN, BILLINGS and BLACKMAR, JJ., concur.

DONNELLY, J., concurs in result.

WELLIVER, J., dissents in separate opinion filed.

WELLIVER, Judge, dissenting.

In this case the Department of Revenue seeks to hold appellant liable for sales taxes incurred before he purchased the property in question in April 1980. The Department bases its claim on two alternative theories. It first claims that appellant purchased the property and business directly from the Manor Inn, Inc., or The Manor Inn Limited Partnership, both of which were controlled by J. Douglas Cassity. Alternatively, the Department argues that even if appellant did purchase the property and business from Great Southern Savings and Loan Association after the latter had acquired the property at a foreclosure sale, appellant remains liable because he is a "successor" for purposes of § 144.150, RSMo 1978. The principal opinion appears to hold for respondent on either or both theories. I do not believe either the facts of the case or the applicable law justifies this result. I respectfully dissent.

Understanding the transactions in this case requires a more detailed statement of the facts than that provided by the principal opinion. The sales taxes in dispute arose from the operation of the Manor Inn, a motel/restaurant complex in Rolla, Missouri. In 1970, Jack and Virginia Rogers executed and delivered to the Carney fami-

---

**4.** Although this might work to deprive the foreclosing Trustee of the full sales price the question of claim priority in this instance is not before this Court. Nevertheless, the statute's withholding requirement reaffirms the general statutory scheme and common law principles found elsewhere in the law making the state's claim paramount to those of other creditors. *See* § 430.330 RSMo 1978; *In Re Holland Banking Company*, 313 Mo. 307, 281 S.W. 702 (Mo. banc 1926).

ly a promissory note for $660,062.69, secured by a first deed of trust on the property. The property in question was later conveyed to the Manor Inn, Inc. in August 1973 subject to the first deed of trust.

In June 1978, with the Carney note in default and foreclosure imminent, the Manor Inn, Inc. executed an agreement with the Carney family whereby the corporation agreed to pay the balance of the note no later than August 1, 1979. Seven months later, in February 1979, the Manor Inn, Inc. executed and delivered to Great Southern a promissory note for $791,395, secured by second deed of trust on the property. This transaction appeared to be for the purpose of funding the prior agreement with the Carney family. In any event, when the balance of the Carney note came due in August 1979, Manor Inn, Inc. again defaulted and the foreclosure commenced.

The property was sold at auction on October 3, 1979 to Great Southern for $902,-000. The trustee delivered to Great Southern a deed conveying title to the real property upon the latter's payment of the purchase price.

The trustee prepared checks for disbursement of the fund as follows:

| | |
|---|---|
| Carney balance on note | $ 541,870.66 |
| Foreclosure Costs | 289.43 |
| Attorney's Fee | 54,187.01 |
| Trustee's Fee | 4,545.00 |
| Balance to Great Southern | 301,107.90 |
| Total | $ 902,000.00 |

Cassity, on behalf of Manor Inn, Inc. and Manor Inn Limited Partnership, submitted to the trustee certain objections relating to the manner in which the sale was conducted. Great Southern objected to the amount of the attorney fee allowed to the attorney for the trustee. As a result of these objections, the trustee filed a declaratory judgment in the circuit court and tendered the proceeds of the sale (the checks) into the registry of the court. Named as defendants in the suit were Manor Inn, Inc. Manor Inn Limited Partnership, Great Southern and members of the Carney family. Manor Inn, Inc. and Manor Inn Limited Partnership filed a counterclaim against the trustee and cross-claims against the other defendants.

In early March 1980, a real estate agency in Springfield, Missouri contacted appellant regarding the property which they said Great Southern was interested in selling if the pending suit could be settled. There is no evidence that in the negotiations which followed either Great Southern or appellant entertained any notion that either Cassity or his companies retained any interest in the property. Appellant neither met with nor spoke to Cassity or his agents during the sale negotiations.

In late March or April 1980, Great Southern and appellant reached tentative agreement. Great Southern's attorney prepared all of the closing instruments and arranged the dismissal of the pending declaratory judgment action. Appellant at no time was represented by counsel. Appellant (and wife) signed and delivered to Great Southern a promissory note for $975,000. Great Southern delivered to appellant a quit claim deed to the real estate and a quit claim bill of sale for the personal property.[1] Appropriate instruments were executed for appellant to take over leases of dormitories leased from the University of Missouri, Rolla. Great Southern's attorney prepared a quit claim deed and a quit claim bill of sale to be signed by Cassity on behalf of Manor Inn, Inc. and Manor Inn Limited Partnership in order to assure appellant that they could not later assert against appellant claims similar to those alleged by them in the declaratory judgment action to which appellant was not a party. Appellant gave Cassity the pick of some gems that appellant valued at about $3,000 as

1. The Director of Revenue presented no evidence as to how Great Southern acquired the personal property and fixtures. Based on business experience we can only assume that there were security instruments and financing statements which were foreclosed simultaneously with the deed of trust foreclosure. This void of evidence alone constitutes a complete failure of proof on the part of the Director of Revenue as to his theory of "successor" in title to the business.

consideration for signing the quit claim instruments. Appellant was the only witness testifying in the proceeding and there is no evidence that he purchased any business from Cassity, the Manor Inn Inc. or Manor Inn Limited Partnership.

The respondent Director of Revenue relies on Section 144.150, RSMo 1978, which provides in relevant part as follows:

All successors, if any, shall be required to withhold sufficient of the purchase money to cover the amount of such taxes and interest or penalties due and unpaid until such time as the former owner or predecessor, whether immediate or not, shall produce a receipt from the director of revenue showing that they have been paid, or a certificate stating that no taxes are due. If the purchaser of a business or stock of goods shall fail to withhold the purchase money as above provided, he shall be personally liable for the payment of the taxes, interest and penalties accrued and unpaid on account of the operation of the business by the former owner and person.

There is no question that this statute gives to the Department of Revenue protection as to unpaid taxes similar to the protection afforded creditors and suppliers by the Missouri Bulk Sales Law, Chapter 400.6, RSMo 1978. Nor is there any question but that one buying a business, as such, should require compliance with both the Bulk Sales Law and this sales tax section and withhold from the purchase price such sums necessary to cover these liabilities. The statute, however, creates no lien of record which the purchaser at a foreclosure sale could find by search of the record. Nothing in the statute gives the Director a priority over any other creditor at a foreclosure proceeding. In fact any lien of record has a priority over the Director of Revenue's claim for unpaid sales tax.

The practical effect of today's decision is that purchasers at foreclosure sales are made liable for unpaid sales tax liability of the person conducting a business in the premises prior to the foreclosure. Most purchasers at foreclosure sales are financial institutions that have loaned the money secured by the property and who must bid on the property in order to protect their interest. If the principal opinion is permitted to stand, sales tax liability will have priority over all other recorded security instruments. The principal opinion in effect reads into the statute a lien priority which does not appear in the statute and which totally disregards our existing law of property, secured transactions and recording. Nothing could have a more chilling effect on the Missouri businessman's ability to borrow money for the conduct of his business.

There was only one witness who testified—the appellant. He denied the purchase of anything from Cassity, Manor Inn, Inc. or Manor Inn Limited Partnership, other than the release of their claims which had been asserted in the declaratory judgment action. This was accomplished by execution of the quit claim deed and quit claim bill of sale prepared by Great Southern's attorney. It is also of some interest to note that all that is required by § 144.150 is that a successor purchaser shall *"withhold sufficient of the purchase money* to cover the taxes and interest and penalties due and unpaid ..."* (emphasis added). If, as suggested by the principal opinion, the alleged $3,000 of gems was a direct purchase price to Cassity for the business, I am at a loss to know how $17,289.03 in unpaid tax liability could be withheld therefrom. If the principal opinion is the judgment of our Court, do we not deny appellant due process of law if we require him to do more than pay to the Director of Revenue an equivalent $3,000 of gems, by himself to be appraised. The statute by its terms requires nothing more.

There can be no dispute that from and after the foreclosure sale Cassity, his corporation and his limited partnership had no remaining business to sell. The principal opinion seeks to justify its result by saying:

In addition the loan agreement between Bates and Great Southern states that the appellant 'contracted with' *Cassity* for

the sale of the Manor Inn business property. Thus it can be said the record permits our conclusion that appellant purchased from and is a successor to Cassity, and provides sufficient competent evidence to support the Commission's determination that appellant was a successor with in the meaning of the statute.

Ante at 276.

The loan agreement prepared by Great Southern, respondent's Exhibit 9, does state in the first "whereas" paragraph:

WHEREAS, Borrower has contracted for the purchase from The Manor Inn, Inc. and The Manor Inn Limited Partnership of a tract of land and improvements thereon known as The Manor Inn in Phelps County, Missouri, being a motel and convention complex, including a water slide, lounges, and other various and sundry improvements;

The loan agreement continues, paragraph 4 and following:

4. Although Borrower shall execute a Nine Hundred Seventy Five Thousand and no/100 Dollar ($975,000.00) note, it is understood that Borrower is receiving a quit claim conveyance from the Association and that the promissory note *represents purchase money paid by the Borrower to the Association for the conveyance and transfer being made by the Association to the Borrower.* No actual disbursements of money shall be made by the Association to the Borrower in consideration of receipt of the note.

5. The Association previously made a loan to The Manor Inn, Inc. *and acquired an ownership in the property by virtue of a foreclosure of a prior and senior deed of trust to the one held by Great Southern.* Since that time the Association has been involved in litigation in Phelps County, Missouri and has entered into a tentative settlement of the pending litigation and as a part of the settlement and resolution of the questions involved in the litigation, *Borrower has obtained a quit claim deed of the interest of The Manor Inn and Manor*

*Inn Limited Partnership in the property....*

(Emphasis added.) The sentence relied on by the principal opinion, written by Great Southern's attorney, is neither binding on appellant nor is it sufficient competent evidence to support the Commissioner's determination that appellant was a successor purchaser of the business within the meaning of the statute. The entire loan agreement together with the testimony of appellant, is conclusive evidence that appellant is not a successor purchaser of the business from Manor Inn, Inc., Manor Inn Limited Partnership or Cassity, but rather that he purchased the business from Great Southern, the purchaser at the prior foreclosure sale. The Court does great harm to the law of secured transactions by in effect holding that the purchaser at a foreclosure sale can be held liable for delinquent sales tax owed by a prior occupant of the premises.

The holding of the Administrative Hearing Commission should be reversed.