IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2002 Session

## IN RE:  THE ESTATE OF LONZO H. KELLEY

**Appeal from the Chancery Court for Montgomery County**
**No. 93-P8-564    Michael R. Jones, Judge**

**No. M2001-00847-COA-R3-CV - Filed July 12, 2002**

Lonzo Kelley operated a grocery store and borrowed a total of $250,000 from Heritage Bank ("Defendant") to operate the store.  After Mr. Kelley died and there was no person or entity willing to assume control of the store, Defendant assumed operation of the store with the stated intent of protecting the assets, some of which were perishable.  Defendant also believed the store would be more valuable at the time of foreclosure if it continued to remain open up until the time of sale. Defendant purchased new inventory and continued to operate the store until foreclosure took place. After foreclosure, and after deducting all expenses, etc., approximately $3,874.88 remained, which Defendant kept on deposit.  Several years later, The Estate of Lonzo H. Kelley ("Plaintiff") filed suit making numerous challenges to Defendant's accounting practices, the manner in which Defendant operated the store, as well as its legal right to assume control of the store.  Both parties filed motions for summary judgment.  The Trial Court granted judgment to Plaintiff in the amount of $9,132.09, but determined Defendant was within its rights to assume control of the store and had not engaged in any wrongful acts while operating the store.  Plaintiff appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which BEN H. CANTRELL, J., and THOMAS W. BROTHERS, SP., J., joined.

Rodger N. Bowman and Lisa Kesting Best, Clarksville, Tennessee, for the Appellant The Estate of Lonzo H. Kelley.

Richard L. Colbert, J. Frank Rudy, Jr., and W. Gregory Miller, Nashville, Tennessee, for the Appellee Heritage Bank.

# OPINION

## Background

Mr. Lonzo H. Kelley died on September 25, 1993. When he died, Mr. Kelley owned and operated a grocery store in Clarksville, Tennessee, and had borrowed, in two loans, approximately $250,000 from Defendant to operate the store. Mr. Kelley's closest living relative when he died was his mother, Mrs. Kelley. Mrs. Kelley declined to serve as Administrator due to health reasons.[1] Defendant telephoned Mrs. Kelley's attorney six days after Mr. Kelley died informing him Defendant desired to take over operation of the store to protect its collateral. That same day, Defendant sent a letter addressed to the "Estate of Lonzo H. Kelley c/o Kelley's Valu Plus Foods" putting whomever received the letter on notice of default in accordance with the terms of the deeds of trust on the two loans. The letter also stated Defendant's intent to take possession of the premises and exercise any available remedies. A copy of this letter was sent to Mrs. Kelley's attorney. Three days later, Mrs. Kelley's attorney responded requesting a copy of the documents giving Defendant the authority to take over the business, and indicating, among other things, it was Mrs. Kelley's position Defendant would assume a fiduciary responsibility to pay normal operating expenses and ensure assets were not disposed of, wasted, etc. On October 15, 1993, Defendant responded by claiming since no estate had been opened, the only manner in which to proceed and cut off claims of potential creditors was by way of foreclosure. Defendant expressly disavowed assuming any fiduciary responsibility and indicated it would proceed based on the "debtor/creditor" relationship. Defendant did point out it was paying normal operating expenses in order to operate the store as a going concern until foreclosure, thereby protecting the value of the assets. On October 20, 1993, Defendant's attorney sent a letter to the "Estate of Lonzo H. Kelley c/o Kelley's Valu Plus Foods" notifying whomever received the letter that a foreclosure sale would take place on November 10, 1993. At the foreclosure, the real estate and inventory were sold for a total of $262,600.

On February 13, 1998, over four years after the foreclosure, Plaintiff filed this lawsuit against Defendant. According to the Complaint, although the amount received at foreclosure was $72,071.43 over the amount owed to Defendant, only $47,398.32 was deposited into the store's bank account after the foreclosure. Plaintiff claimed the Administrator requested an accounting, but was not provided with proper records. Plaintiff asserted the records which were provided showed Defendant had sold approximately $400,000 in goods and assets after taking possession, and Plaintiff was entitled to these proceeds. Plaintiff claimed Defendant breached its contract by failing to provide a proper accounting of these funds. In the Complaint, Plaintiff asserted various causes of action based on breach of contract and violations of the Tennessee Uniform Commercial Code centered primarily around alleged improper accounting practices and failure to account for the funds referenced above. Plaintiff further claimed the assets of the store were commingled with

---

[1]An Administrator was not actually appointed until May 18, 1994, well after the events giving rise to this lawsuit had occurred.

Defendant's assets purchased during the operation of the store, and, therefore, the assets belonging to the estate could not be identified.

Defendant's answer essentially denied any improper accounting and asserted all funds were handled appropriately. Defendant claimed the amount Mr. Kelley owed on the two loans at the time of his death was $210,042.47. According to Defendant, the $47,398.32 deposited into the account was the amount received at foreclosure after deducting the amount owed to Defendant in accordance with the deeds of trust.

The Security Agreement signed by Mr. Kelley granted Defendant a security interest in all of the chattel paper, documents, instruments, accounts, goods, general intangibles, equipment, inventory, and any and all other personal property in the business. The Security Agreement granted Defendant numerous rights upon default. As relevant to this appeal, the following provisions are in the Security Agreement:

> Acceleration and Foreclosure, Etc. Upon the happening of any Event of Default specified in Section 3, and at any time hereafter … Secured Party will have and may exercise any or all of the rights and remedies of a secured party under the Uniform Commercial Code as adopted in the State of Tennessee, and as otherwise granted herein or under any other law … including, without limitation, the right and power to sell, at public or private sale or sales, or otherwise dispose of or utilize such portion of the Collateral and any part or parts thereof in any manner authorized or permitted under said Uniform Commercial Code after default by a debtor, and to apply the proceeds thereof toward payment of any costs and expenses and attorney's fees and legal expenses thereby incurred by Secured Party and toward payment of the obligations in such order or manner as Secured Party may elect.
>
> * * * *
>
> (a) Secured Party will be under no duty to collect any amount which may be or become due on any of the Collateral now or hereafter pledged hereunder, to realize on Collateral, to collect principal, interest or dividends, … to make any presentments, demands or notice of protest, in connection with any of the Collateral, and to do anything for the enforcement and collection of the Collateral or the protection thereof.
>
> (b) Not limiting the generality of the foregoing but in amplification of the same, Secured Party will be in no way liable to or responsible

for any diminution in the value of the Collateral from any cause whatsoever, other than the active misfeasance of Secured Party.

* * * *

SECTION 6. GENERAL AUTHORITY. Upon Default on Debtor's part hereunder, Debtor hereby irrevocably appoints Secured Party as Debtor's true and lawful attorney-in-fact with full power of substitution, in Secured Party's name or Debtor's name or otherwise, for Secured Party's sole use and benefit, but at Debtor's cost and expense, to exercise at any time and from time to time all or any of the following powers with respect to all or any of the Collateral:

> (a)   to demand, sue for collection, receive and give acquittance for any and all monies due or to become due upon or by virtue thereof;
>
> (b) to receive, take, endorse, assign and deliver any and all checks, notes, drafts, documents and other property taken or received by Secured Party in connection therewith;
>
> * * * *
>
> (d) to sell, transfer, assigns (sic) or otherwise deal in or with the same or the proceeds thereof as fully and effectually as if Secured Party were the absolute owner thereof; …

Mr. Kelley also executed a Deed of Trust, Assignment of Leases and Security Agreement to Secure Heritage Bank. In this document, Mr. Kelley granted Defendant a security interest in the real estate upon which the store was located, in return for a $225,000 loan. As additional security, Defendant was granted a security interested in, inter alia, fixtures, personal property, goods, equipment, inventory, etc., located on the premises. As relevant to this appeal, this document provides the following remedies upon default:

> **15.   REMEDIES UPON DEFAULT.** Upon default, the Trustee and/or the Beneficiary … may at their discretion and without any notice to the Grantor except as specified below, do any one or more of the following:
>
> > (e) **Possession.** The Beneficiary may, at its option, enter upon and take possession of the Premises without the appointment of a receiver, or any application therefor, obtain the appointment of a receiver to exercise any remedies of the

-5-

Beneficiary or the Trustee hereunder; employ a managing agent of the premises and lease the same, either in its own name, or in the name of the Grantor; and collect the rents, incomes issues and profits of the Premises.

\* \* \* \*

(h) **Attorney-In-Fact.** Any legal proceeding, contractual obligation, further assignment or other action taken by the Beneficiary in the course of exercising its remedies hereunder may be entered into or initiated by the Beneficiary either in its own name as the Grantor's assignee or in the name of the Grantor. The Grantor hereby irrevocably appoints the Beneficiary as the Grantor's attorney-in-fact for the purpose of taking any such action upon default hereunder.

(i) **Application of Proceeds of Foreclosure and Other Remedies.** All amounts received by the Beneficiary pursuant to the exercise of remedies hereunder shall be applied first to expenses due the Beneficiary or the Trustee including, but not limited to, expenses of foreclosure and all expenses incurred in leasing the Premises, retaining a managing agent therefor, or fulfilling the Grantor's obligations under any Lease, including attorney's fees; second, to interest included in the Secured Indebtedness; third, to principal included in the Secured Indebtedness, in such order as the Beneficiary may elect; and the surplus, if any, paid to the party or parties entitled thereto.

30. **IRREVOCABILITY OF POWER OF ATTORNEY**. Whenever in this Instrument the Beneficiary is appointed as attorney-in-fact of the Grantor, such power of attorney is coupled with an interest and is irrevocable and will not be affected by the death, disability, or incapacity of the Grantor.

Both parties agree that after deducting the amount owed to Defendant for the two loans and after deducting property taxes paid by Defendant, a total of $47,398.32 remained after foreclosure. The parties also agree: (1) Defendant incurred $5,786.51 in legal fees associated with default and foreclosure; (2) gross receipts during the time Defendant operated the store (including the excess after foreclosure and after deducting the property taxes) plus the opening cash balance totaled $414,614.48, and disbursements during this same time period totaled $410,739.60. Plaintiff admits these totals in responses to requests for admissions, although in other responses Plaintiff attempts to qualify the admissions by claiming they are accurate based on documents Defendant

currently possesses, thereby implying the admission may change if other documents are produced. Defendant's controller prepared a Summary of Cash Receipts Disbursements. Plaintiff admitted these documents "reflect the receipts and disbursements as the bank has records to establish same."

Defendant filed a motion for summary judgment relying on the above admissions as well as certain affidavits, including the affidavit of Earl O. Bradley, III ("Bradley"), a certified public accountant since 1980 and Defendant's President and Chief Financial Officer since 1988. Bradley stated Mr. Kelley owed Defendant a total of $210,042.47 for two loans which were secured by security agreements. When Mr. Kelley passed away, Defendant became "immediately concerned" since there was no one to operate the store. Several large checks written by Mr. Kelley were presented for payment, but there were insufficient funds for payment, thereby causing Defendant to believe its "collateral position was in jeopardy." After meeting with Defendant's Board of Directors and legal counsel, it was determined the best way to proceed was to assume control of the store and continue operations until the assets could be liquidated via foreclosure. This procedure would preserve the perishable inventory and maintain a customer base until a new owner could be located. Mr. Kelley's mother was notified of Defendant's intent to assume control of the store and no objection was made. Defendant took steps to operate the store in the same manner as Mr. Kelley and retained most of the employees. Virtually all of the store's existing suppliers were kept in place and disbursements made in the ordinary course of business to these vendors. None of Defendant's employees were paid from store receipts for the time devoted to operating the store.

Bradley stated the store (including personalty and real estate) were sold at auction for a total of $262,600.00. After paying off the two loans made by Defendant and paying property taxes, $47,398.32 remained. The store receipts during the time Defendant operated the store totaled $339,207.40. When adding to this sum the opening balance of the account, insurance refunds, and the excess proceeds after foreclosure, the total store receipts were $414,614.48. During the same time, the total cash disbursements were $410,739.60, leaving $3,874.88, which was placed on deposit with Defendant. Defendant's Controller prepared a ledger and a Summary of Cash and Disbursements with seventeen pages of supporting documentation. Both of these documents were filed with Bradley's affidavit. In his affidavit, Bradley stated the Summary and the ledger accurately reflected all store receipts and disbursements.

A portion of Bradley's deposition also was submitted in support of the motion for summary judgment. In his deposition, Bradley acknowledged Defendant could not locate some of the underlying records supporting the totals contained in the Summary and ledger. Bradley, however, stated all of the records supporting the consolidated return for the grocery store had been sent to Defendant's accountants. Bradley then testified as follows:

> There were numerous people that looked [for these records] including myself. I saw records several times. I know where they were, what box they were in. The bank moved several times.

But during this process, we wrapped up the affairs of this store. There was nobody there to accept it. We were ready to – ready to- willing to go and show all of this information.

Your predecessor, Mr. Hayes, it is my recollection that we did, in fact, try to give him documents. … [The accountants] would have wrapped up there (sic) '93 work a long time ago. I would not think they would have those records.

Defendant also filed the affidavit of Jan Roberts ("Roberts"), Defendant's Operations Officer for over 10 years. Roberts stated Defendant's collateral was in jeopardy since Mr. Kelley had died and no one was available to operate the store. Roberts believed the store was more valuable as a going concern than it would be if sold in liquidation. Roberts assisted with accounting and financial matters during the time Defendant operated the store. According to Roberts, all disbursements were made in the ordinary course of business for the purchase of inventory replacement, routine overhead expenses, and taxes. No unusual disbursements outside the ordinary course of business were made. Roberts did not recall any vendors being paid for goods which were supplied prior to Mr. Kelley's death. It was Robert's recollection suppliers who delivered goods after Mr. Kelley's death were paid in full.

Sharon Teacher ("Teacher") also furnished an affidavit. Teacher became employed at Mr. Kelley's store in 1990 as a bookkeeper. She also assisted in store operations and performed clerical work. According to Teacher, when Mr. Kelley died the store was "suffering financial difficulties and cash flow shortages". No one was available to assume operation of the store when Mr. Kelley died. Defendant asked Teacher to assume operation of the store, but she declined. Teacher stated it was her responsibility both before and after the time Defendant took over the store to deposit receipts, approve disbursements, and sign checks. Once Defendant took over operations, she was primarily responsible for handling receipts and disbursements. According to Teacher:

All disbursement whether made by myself or Bank employees were for ordinary expenses to store vendors for the purchase of products for inventory replacement and for routine overhead expenses such as utility charges or taxes. Throughout the period of time in which the Bank operated the store there were no unusual disbursements outside of the ordinary course of business. The store operated in the same manner both before and after Mr. Kelley's death.

Plaintiff filed a cross motion for summary judgment and filed the affidavit of Theodore Hay ("Hay"), the Administrator of the estate from May 18, 1994, to July 25, 1997. According to Hay, he filed a motion with the probate court seeking an order requiring Defendant to provide an accounting for the time frame in which it operated the store. Hay claims he was told three times by Defendant an accounting would be forthcoming. Hay further stated he was never provided with an accounting. He further claimed "no one from Heritage Bank offered to tender

documents or money as they dealt with an accounting in relationship to Heritage Bank's operation of the store or the foreclosure nor did anyone offer to pay funds to the Estate of Lonzo H. Kelley for any overage." Plaintiff also filed the affidavit of Lawrence Cox ("Cox"), who had worked with Mr. Kelley and at one time was Mr. Kelley's business partner with the store. Cox detailed the record keeping system utilized by Mr. Kelley and opined that failing to maintain certain records would mean the store was not being operated in the ordinary course of business.

In Plaintiff's motion for summary judgment, and as relevant to this appeal, Plaintiff claimed: (1) Defendant did not have the right to assume control of the business; (2) Defendant was required to petition the Court for approval to operate the business; (3) Defendant failed to take an inventory of the assets before assuming control; (4) Defendant failed to account properly for the assets and funds and, therefore, cannot demonstrate the expenditures were in the ordinary course of business or reasonable; (5) Defendant improperly co-mingled the assets of the estate with the assets purchased after Defendant assumed control; and, (6) Defendant failed to use reasonable care in the custody and preservation of the collateral.

The Trial Court carefully reviewed all of the evidence before it, even going so far as to detail the particular documents upon which it relied more heavily in reaching its conclusions. The Trial Court found, inter alia, as follows:

> After the death of Lonzo Kelley the employees of Kelley's Value Plus continued to run the store. The only heir of Lonzo Kelley, Mildred Kelley, refused to assume the responsibility of running the business. The notes were in default. The plaintiff has argued that Heritage "could have" acted in a different fashion. Heritage could have qualified as administrator just like other creditors including the present administrator. Many persons and entities could have acted other than he/she/they or it did; however, the plaintiff has not shown that Heritage acted illegally or outside its contractual rights.… If Heritage paid other creditors from the proceeds in 1993 or 1994, the present administrator can not complain that these creditors were not paid pro rata based on 1997 or thereafter determination. Heritage was a secured creditor, it was not an administrator.
>
> Heritage was faced with a dilemma; not take possession and foreclose or take possession, protect the assets and then foreclose. In 1993 Heritage's position was much the same as Western Auto Supply Company (American City Bank of Tullahoma vs. Western Auto Supply Company, 631 S.W.2d 410). Groceries are similar to Christmas inventory. This was compounded by the fact that the grocery was "open for business." There is nothing contained in the court file that established that Heritage failed to act in good faith in taking possession and operating the business. The contrary is

-9-

established by the affidavits of Jan Roberts and Sharon Teacher. Further the Summary of the Cash Receipts and Disbursements … established that $167,046.21 of inventory was purchased during the operation …. This inventory or remaining portion of this inventory was sold at foreclosure. All of the expenditures shown are not only business related, but required. The continued operation of the business by Heritage appears to have benefited (sic) the estate, rather than have been a detriment to the estate.

The plaintiff has not questioned the validity of either of the notes. The parties have both agreed that both notes described in the pleadings were secured. Paragraph 13 of the Deed of Trust, Assignment of Leases and Security Agreement to Secure Heritage Bank covers the payment of attorneys fees in reference to the foreclosure. Further paragraph 15(1) specifically authorizes the Bank to fulfill any of the Grantor's (Lonzo Kelley) obligations under any Lease. The Bank was required to pay from the proceeds first the attorney fees, the lease amount, interest and principal.

The Court finds as follows:

1.     A judgment should be entered against Heritage for $3,874.88 balance presently held by Heritage from the foreclosure sale.

* * * *

3.     Further the judgment should include … [$2,648.81]. The foreclosure notice provided for the property being sold subject to property taxes and Heritage had control over the closing of the sale …. The amount of $2,648.81 is to be included in the judgment for property taxes.

4.     There is no evidence that Heritage wrongfully paid any amounts and in particular to Commercial Bank and Trust. This payment appears to be required pursuant to the terms of the deed of trust and/or security agreement.

5.     The judgment shall not include any amounts from the … operating account except as stated above. The opening balance and deposits were used in the ordinary course of business to preserve the assets and maintain the value of the store. Nothing to the contrary

-10-

has been established. The Court as stated above has examined the summary of this account as well as the account.

* * * *

8. The interest charged … [after] the date of foreclosure on both notes should be a part of the judgment. The plaintiff indicated that this amount is $2,608.40. …

9. The $47,498.32 characterized by the plaintiff as an overage is not an overage. The summary of the … account and the account establish this. The judgment shall not include this amount.

Plaintiff appeals the Trial Court's conclusions and phrases the issue on appeal as follows:

Whether a secured party can take possession of deceased debtor's personal and real property, continue to operate the deceased debtor's business as a going concern and charge all expenses and losses to debtor's estate where the secured party failed to take an inventory, made large perishable and inventory purchases, co-mingled the existing inventory and new purchases, paid pre-existing obligations, and is unable to produce receipts, sales records, or other documentation to substantiate the accuracy or reasonableness of its transactions.

In its brief, Plaintiff breaks this lengthy issue down further into various sub-issues. All of the issues, however, center around : (1) whether Defendant properly assumed control of the store; (2) whether Defendant's accounting practices violated any duty of care; (3) whether Defendant acted properly with regard to the existing assets or otherwise violated a duty of care during the time it operated the store.

## Discussion

The standard for review of a motion for summary judgment is set forth in *Staples v. CBL & Associates, Inc.*, 15 S.W.3d 83 (Tenn. 2000):

The standards governing an appellate court's review of a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tenn. R. Civ. P. 56 have been met. *See Hunter v. Brown*, 955 S.W.2d 49,

-11-

50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991). Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *see Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993). The moving party has the burden of proving that its motion satisfies these requirements. *See Downen v. Allstate Ins. Co.*, 811 S.W.2d 523, 524 (Tenn. 1991). When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact. *See Byrd v. Hall*, 847 S.W.2d at 215.

To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. *See McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail. *See McCarley v. West Quality Food Serv.*, 960 S.W.2d at 588; *Robinson v. Omer*, 952 S.W.2d at 426. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply rest upon the pleadings, but must offer proof to establish the existence of the essential elements of the claim.

The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d at 426; *Byrd v. Hall*, 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

*Staples*, 15 S.W.3d at 88-89. A fact is "material" for summary judgment purposes, if it "must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999)(quoting *Byrd v. Hall*, 847 S.W.2d at 211).

We first address Plaintiff's argument that Defendant did not have the right or power to assume control of the business. Plaintiff asserts: (1) the language in the Deeds of Trust and Security Agreements did not permit Defendant to assume control of the store; and (2) Tenn. Code Ann. § 30-2-322 required Defendant to petition the probate court for permission to continue operation of the store prior to doing so. In relevant part, this statute provides:

> **30-2-322. Continuation of decedent's business.** – (a)(1) The probate court of the county of decedent's residence at the time of decease, when not contrary to the provisions of decedent's will, if any, may authorize the personal representative to continue the business of the decedent upon such conditions as it may impose, for an original period not exceeding nine (9) months from the date of the executor's or administrator's appointment. Such authority may be granted upon such notice as the court considers reasonable, or without prior notice, either at the time of the qualification of the personal representative, if the petition for such appointment contains a prayer therefore, or thereafter during the period of administration.

This statute did not require Defendant to petition the probate court for permission to operate the store prior to assuming control. While Defendant certainly could have proceeded pursuant to this statute, the language in the statute is permissive and not mandatory and does not purport to provide the exclusive procedure that may be followed. The statute also may have come into play if there were competing entities or persons who wanted to assume control of the store. The undisputed facts show no one, except Defendant, was willing to assume responsibility for the store, thereby putting at risk the perishable inventory. Requiring Defendant to petition the probate court for permission to operate the store would essentially eviscerate the language in the security agreements and deeds of trust expressly agreed to by Mr. Kelley and Defendant pertaining to Defendant's rights upon default. We do not believe this was the intent of the legislature in Tenn. Code Ann. § 30-2-322. We disagree with Plaintiff's argument that Tenn. Code Ann. § 30-2-322 required Defendant to petition the probate court for permission to operate the store despite the contractual agreements between Mr. Kelley and Defendant to the contrary.

Plaintiff further argues Defendant's non-compliance with Tenn. Code Ann. § 30-2-322 resulted in ineffective notice to the estate of Defendant's intent to assume control of the store and foreclose on the property. Since we have held Defendant was not required to petition the probate court before assuming control of the store, we likewise reject this argument. In any event, the correspondence between Defendant and the attorney for Mrs. Kelley, who was the sole heir of the estate, certainly was notice to Mrs. Kelley and her attorney as to Defendant's intentions.

-13-

With respect to the collateral, the Security Agreement specifically and unequivocally grants Defendant the right, upon default, to "sell, transfer, assigns (sic) or otherwise deal in or with the same or the proceeds thereof as fully and effectually as if Secured Party were the absolute owner thereof". This is exactly what Defendant did. Plaintiff relies on *Bank of Commerce v. Woods*, 585 S.W.2d 577 (Tenn. 1979) to support the argument that Defendant did not have authority to operate the store "in the way that it did." In *Woods*, Bank of Commerce was a secured creditor of a food store. When the owners fell behind on their payments and defaulted, the Bank purchased the store because it felt it would be better able to sell the store in the future if it remained open and a going concern. The issue to be decided by our Supreme Court was whether the bank was a successor under relevant statutory law and could thus be held liable for past due sales taxes not paid by the previous owners. The Court held it was a successor, and the Bank could have determined prior to purchase if there was any outstanding tax liability. *Id*. at 582. If there was any outstanding tax liability, the Court pointed out this "would have been one more factor to weigh in the decision whether to foreclose on their security interest or continue the business." *Id.* To the extent *Woods* has any bearing whatsoever on the issues presently before this Court, it tends to support the position of Defendant. It certainly does not support Plaintiff's argument. The undisputed facts show Mr. Kelley had passed away and no one was willing to assume control of the store which had perishable inventory. Believing the store would sell at auction for more if it continued as a going concern, Defendant exercised its right under the Security Agreement to proceed as if it were the "absolute owner" of the store.[2]

The next series of issues center around Defendant's inability to produce all the records which support the monetary totals set forth in the Summary of Cash and Disbursements and the ledger prepared by Defendant's controller. Defendant maintains at one point these records were made available to the Administrator who declined to review them. Thereafter, the records were lost during one of Defendant's moves to a different location. Plaintiff asserts the Administrator requested these documents on numerous occasions, but they never were provided. In any event, Plaintiff claims Defendant's inability or refusal to produce these documents violated its duty to make an accounting to the estate, was a violation of Defendant's fiduciary responsibility, a breach of Defendant's duty of reasonable care under the Uniform Commercial Code, and a breach of contract.

Defendant served upon Plaintiff requests for admissions. In the response, Plaintiff admitted the gross receipts during the time Defendant operated the store were $414,614.48, which sum included the $47,398.32 remaining after the store was sold at auction and the loans paid. Likewise, Plaintiff admitted the total disbursements during the same time period were $410,739.60, leaving a balance of $3,874.88. According to the affidavit of Bradley, the Summary of Cash and Disbursements and the ledger accurately reflect all store receipts and disbursements, and all disbursements were made in the ordinary course of business. Roberts stated in her affidavit all disbursements were in the ordinary course of business for the purchase of inventory replacement,

---

[2] There has been absolutely no proof presented to the Trial Court or this Court showing Defendant was incorrect in its belief that the store would be more valuable at auction if it continued to remain open until the time of foreclosure.

routine overhead expenses, and taxes.[3] Finally, Kelley, who worked at the store since 1990 as a bookkeeper, stated in her affidavit all disbursements were made in the ordinary course of business. Plaintiff has offered no *proof* whatsoever that any of the disbursements were made outside the ordinary course of business. Plaintiff claims an inability to verify the accuracy of these totals because the underlying records are not currently available. This argument does not create a disputed issue of material fact for several reasons. First, Plaintiff admits in the responses to requests for admissions the totals are accurate. Second, Plaintiff has offered no proof by affidavit or otherwise claiming the information which has been supplied in the Summary of Cash and Disbursements is inadequate to verify the accuracy of these totals. Third, Plaintiff has offered no proof any of the disbursements (the totals of which are admitted as accurate) were made outside the ordinary course of business. The affidavit of Cox discusses only what Cox believed to be the proper record keeping process. Cox does not state any of the disbursements were outside the ordinary course of business nor does he challenge the accuracy of the Summary of Cash and Disbursements.

In summary, what the Trial Court was faced with was three affidavits attesting that all disbursements (the total of which was admitted) were in the ordinary course of business. The Trial Court then reviewed the Summary of Cash and Disbursements and the seventeen pages of supporting documentation, and concluded there was no evidence Defendant wrongfully paid any amounts and the opening balance and deposits were "used in the ordinary course of business to preserve the assets and maintain the value of the store. Nothing to the contrary has been established." We agree with the Trial Court that the undisputed material facts demonstrate all disbursements were in the ordinary course of business to preserve the assets and maintain the value of the store.

When exercising rights under the Uniform Commercial Code upon default, a secured creditor is bound by the good faith requirements found throughout the Code and must exercise these rights in a commercially reasonable manner. *See American City Bank of Tullahoma v. Western Auto Supply Company*, 631 S.W.2d 410, 420 (Tenn. Ct. App. 1981). For purposes of this appeal of the Trial Court's grant of summary judgment to Defendant, we will assume, without deciding, that the Uniform Commercial Code applies. We hold, as did the Trial Court, that the undisputed material facts establish Defendant acted reasonably and in a commercially reasonable manner and in good faith. All of the various sub-issues set forth by Plaintiff challenging Defendant's record keeping, accounting practices, purchase and sale of inventory, violation of alleged duties, etc., are hereby rejected.

In short, we believe the Trial Court properly applied all summary judgment standards and did not err in its judgment. Based upon the record before us, we agree with the Trial Court that

---

[3] Plaintiff also argues Defendant did not have the right to purchase new inventory and/or this was a bad decision and a breach of Defendant's claimed duties. Because we conclude, given the somewhat peculiar facts of this case, that Defendant had the right to assume control of the business and operate it as a going concern until sold at foreclosure, we likewise conclude the various issues raised by Plaintiff challenging Defendant's purchase of new inventory and commingling of same with the existing inventory are without merit.

both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion, that conclusion being that Defendant properly exercised its contractual rights. We, therefore, find no error by the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against the Appellant, the Estate of Lonzo H. Kelley, and its surety.

_____
D. MICHAEL SWINEY, JUDGE